**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 2 0 2022

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JANE DOE                                                                    PLAINTIFF

v.                                        Case No: 4:22-cv-870-KGB

TERRY FLEMING

                                                                           DEFENDANT

## COMPLAINT

COMES NOW, the Plaintiff, Jane Doe, by and through her attorneys, Sutter &

Gillham, PLLC, and for her cause of action against Defendant, states as follows:

## PARTIES & JURISDICTION

1.      This action is against Terry Fleming (hereafter "TF"), and his corporations

which participated and benefited in an illegal scheme violating the Trafficking Victims

Protection Act 18 U.S.C. §1591. This action is brought as allowed by 18 U.S.C. §1595

2.      Plaintiff, **Jane Doe**, whose initials are B.C., is an Arkansas citizen who was

first a victim of Defendant's trafficking at the age of 19. She resides in Saline County,

Arkansas. TF lured Plaintiff to his property in Pulaski County, Arkansas where a majority

of the criminal violations occurred. The Act supports protection of victims who should be

motivated to come forward and report these heinous crimes. Undersigned Counsel will

provide Plaintiff's identity to counsel for Defendant upon proper effectuation of service.

3.      Defendant, **Terry Fleming**, is an Arkansas Citizen and resident of Pulaski

County, Arkansas. He may be served at his residence: 1010 Sanctuary Dr., Little Rock,

AR 72223, (hereafter "Compound").

4.      In the ways outlined by this Complaint and at all relevant times mentioned

This case assigned to District Judge Baker
and to Magistrate Judge Harris

herein, the Defendant operated and/or participated in a joint venture for the purpose of violating the TVPA either directly or through the agency of each other and/or other agents, subsidiaries, servants, or employees.

5.     Because the Defendant named herein and others were engaged in a joint venture/enterprise during relevant times, and because TF controlled all of the entity defendants named herein, the acts and omissions of each participant in the joint venture/enterprise are imputable to all other participants. The actions of the Defendants and each of its servants, agents and employees as set forth herein, are imputed to each of the Defendants, jointly and severally.

6.     Whenever the term "Defendant" and/or "Defendants" is utilized within this suit, such terms collectively refer to and include all named defendants and John Doe Defendants.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the parties and subject matter of this Complaint pursuant to 28 U.S.C. §1331.

8.     Venue is proper pursuant 28 U.S.C. §1391.

9.     Pulaski County is where a substantial part of the events or omissions giving rise to the causes of action occurred.

10.     Pulaski County is where TF resided at the time of the events or omissions giving rise to the causes of action.

11.      Pulaski County is where the Defendant entities had their principal offices in Arkansas at the time of the events or omissions giving rise to the causes of action.

### *The Trafficking Pattern and Practice*

12.     For the past 10 years and more, TF repeatedly used a well-established, specific procedure for luring hundreds of young women into his trafficking scheme between 2012 and the time of the filing of this Complaint.

13.     TF would attend strip clubs in the regular company of a prominent businessmen and their spouses who helped TF lure hundreds of victims to his residence Compound.

14.     Other women who were already victims ensnared in TF trafficking force field also helped lure women to the Compound.

15.     The businessperson, his wife, and the other victims mentioned above are hereafter referred to as the Entourage.

16.     TF also promised Plaintiff art, illegal ivory and coral at the Compound, lavish life styles, and gifts.

17.     TF would say, "You have hit the jackpot now".

18.     Upon arrival to the extravagant Compound, these girls (hereafter "victims")  including Plaintiff were given specifically selected wines, in part for their intoxicating effects.

19.     TF also called these wines outside the presence of those he lured, aphrodisiacs.

20.     TF would say to his recruiting Entourage and to victims already ensnared: "Candy is dandy but liquor is quicker."

21.     TF would also provide a "blunt" of marijuana as a "party favor" beginning around 2015.

22.     Worst of all, victims would be drugged throughout the times associated with this Complaint beginning in 2012.

23.     Many victims including Plaintiff awoke at the Compound with the feeling that they had blacked out or with minimal memory of what happened while realizing they had been sexually violated.

24.     Most were led to believe they drank too much.

25.     Most were not used to the special wine.

26.     This happened to Plaintiff.

27.     Many awoke in TF's own bed, dazed and confused.

28.     He knew these effects caused victims to lose self-control, judgment, critical thinking, to suffer blackouts, and to have less or no motor control, as well as to suppress the autonomic nervous system.

29.     He nevertheless intentionally drugged the victims, often without their knowledge or while already in a highly intoxicated state under circumstances that are equivalent to a lack of consent.

30.     This happened to Plaintiff.

31.     TF intentionally used other victims to procure and sometimes introduce these drugs to victims at the Compound in TF's presence.

32.     These victims were already well entrenched in the coercive and manipulative force field of TF's trafficking scheme.

33.     The scheme outlined herein occurred on the average of once or twice a week and Visions in Pulaski County, Arkansas was a favorite location.

34.     Plaintiff was selected for her beauty, innocence, naiveté, young age,

4

and psycho-social challenges.

35.     In July of 2012, TF approached the Plaintiff who was just past the age of majority, nineteen.  He promised her expensive meals, wine, and gifts.  He told her he loved her.  All of this was untrue.

36.     In August of 2012, TF continued plying the Plaintiff with alcohol.  These alcoholic drinks caused Plaintiff to black out and be incapable consent.

37.     TF also promised Plaintiff trips on yachts and private planes.  Eventually, TF promised to take Plaintiff to Key West Florida on his jet on 9/20/2012.  Plaintiff was nineteen.  TF gave Plaintiff alcohol and told her he loved her.  But TF didn't love the Plaintiff.  TF simply wanted to use Plaintiff and other young women as commercial sex partners.

38.     In September of 2012, TF, a local businessman, his wife, and the Plaintiff left from the Little Rock, Airport on Defendants' jet for Key West.  On the jet, TF continued to ply Plaintiff with alcohol, despite the fact Plaintiff was underage.

39.     When they landed in Key West, Plaintiff was drunk.  TF took Plaintiff to his house where TF kept feeding Plaintiff alcohol such that she blacked out.  When Plaintiff awoke, she learned that she had had sex with TF while too drunk to remember.  So, she became scared and asked TF to take her home.  Initially, TF refused.  But Plaintiff then learned her brother was in an accident, so TF relented and took Plaintiff home.

40.     For example, marriage was promised to Victim A and others.

41.     An engagement ring and/or car would be "gifted".

42.     The better life he financially promised and created would be abruptly ended

or threatened to be ended if full victim compliance with TF demands did not occur.  Or TF would sue to coerce victims to keep their mouth shut.

43.     When Victim A would leave TF's company temporarily for any reason including a short trip, she wanted to take the Xanax pills in TF's possession with her so that TF could not use them on other women.

44.     TF would get furious, threatening, and physically forceful to prevent removal of the drugs.

45.     Much more in quantity than TF could ever have ingested himself during the short absence of Victim A.

46.     Many victims were chosen for their tragic past and upbringing.

47.     TF coached Plaintiff and other that facts were to be determined in the sorting process at the strip clubs or in other communications with him or the Entourage.

48.     TF's Entourage would befriend targets. TF would encourage his Entourage to be nice, to tell secrets to learn their secrets, then to solicit sex for TF.

49.     All part of a sick script repeated over and over ultimately damaging Plaintiff.

50.     Victims who had been previously raped or sexually molested were particularly desired.

51.     TF perceived them to be more subject to victimization, less likely to report, more subject to manipulation.

52.     TF and his entourage also targeted those with poor or no family support, those living under dire financial circumstances, or even without a place to live.

53.     Plaintiff fit many of these categories.

54.     If TF and the Entourage were unsuccessful in original attempts to

victimize, follow up efforts would ensue.

55.     Members of the Entourage would describe TF in favorable terms and set up dates.

56.     First, TF would plan a date to one or two prominent restaurants in the City of Little Rock.

57.     TF had arrangements with several to serve alcohol to minors in his company.

58.     This was accomplished over and over and continues to this day.

59.     Then after a good dinner and two bottles of wine, the Compound process would follow including the use of drugs as described above.

60.     All of the victims that would awaken from drug induced black out, would be told by TF: "You are not a prostitute but here is some money."

61.     Often TF would pay $1,000 the first time. To the Plaintiff, this meant the difference between living and dying. $1000 changed her life and TF knew it. He used these monetary "gifts" to further Plaintiff's dependence on him. He knew that this would entice Plaintiff to have sex with him.

62.     TF intentionally tried to condition victims to focus on the financial assistance he offered to the exclusion of the horror of their sexual violation by TF.

63.     TF secured in this way sex he could not procure legally.

64.     The next stage of the trafficking scheme included a number of tactics again used over and over.

65.     They included more forceful coercion even in the act of commercial sex itself.

66.     As TF aged, his physical process for consummating sex became very frustrating and time consuming to him.

67.     TF would become very frustrated, hateful, demanding, and rude.

68.     All in forceful and fearful ways for the victims already ensnared in the process of statutory involuntary servitude as described herein.

69.     Under all of these circumstances, TF was not just interested in personal sexual gratification, he took a perverse, sadistic motivation and pleasure in corrupting and traumatizing his young targets.

70.     TF would say "I don't give a f**k about what people do with their money."

### *More Facts About Plaintiff*

71.     Plaintiff had no phone or car when first invited to a party at the Compound.

72.     Before meeting TF, Plaintiff came from a challenging background.

73.     She had been previously raped.

74.     She had no car and no phone.

75.     She had no significant financial or other support.

76.     Plaintiff did not stay at the Compound during the first party visit.

77.     However, she still does not remember how she got home that night.

78.     She had been lured to the Compound in a way that conformed to the standard procedure outlined above.

79.     She was asked by a member of the Entourage: have you heard of Louis Viton?

80.     He laid a pile of cash in front of her.

81.     Ever ridden in a private jet, TF asked?

82.     TF told Plaintiff many times: "You have hit the jackpot".

83.     Another girl from the Entourage also befriended her.

84.     She was a bit older than Plaintiff who was age 19 at the time.

85.     Plaintiff was invited to the Compound as part of a group of girls going to a "party."

86.     She could not drink at her job at Visions.

87.     She was given wine at the Compound in TF's presence.

88.     After losing memory of how she got home, it did not occur to her that she had been drugged.

89.     Then she was approached by a woman sent by TF.

90.     She said: TF has been looking for you.

91.     TF was described as a wonderful guy just interested in having a date with her.

92.     She said TF would buy her a phone.

93.     He did so personally.

94.     It was purchased from AT&T on Chenal in Little Rock near the bookstore.

95.     On the first date, the other female victim who recruited Plaintiff was present.

96.     During the date, dinner and alcohol was served at one of the previously mentioned restaurants.

97.     TF then returned Plaintiff to her home.

98.     TF said I'll help you out and handed Plaintiff some money.

99.     After a few such dates, TF invited Plaintiff on a trip to China where everything changed.

100.    Before the trip, Nicki Tackett, an employee of PV, at TF's direction arranged an expedited passport for her.

101.    Plaintiff was transported to China on the PVI LLC jet with TF aboard along with the victim that recruited Plaintiff.

102.    Plaintiff was given alcohol again but awakened with little memory and confusion.

103.    She realized she had been sexually violated by TF.

104.    She thought, wow, what just happened?.

105.    Plaintiff experienced all these what ifs.

106.    She felt trapped away from Little Rock.

107.    She beat herself up.

108.    It never occurred to her that she had been drugged.

109.    TF used his wealth and deception to lure Plaintiff and many other victims further into his web of financial dependence, coercion, intimidation, manipulation, and control.

110.    TF would make those most attractive to him, including Plaintiff, think he wanted to marry them.

111.    That they would be the "only one."

112.    Then he would use business and personal credit cards to set other victims up in hotels for a month at a time behind the back of Plaintiff and other victims.

113.    Other victims would be transported with Plaintiff to interstate and foreign

destinations where looking back, Plaintiff believes that drugs were put in her drinks and those of other victims.

114.    Plaintiff remembers on one occasion in the Bahamas, at an event called a Wahoo Tournament, a victim was drugged during the night and ended up mindlessly walking down a road to her great jeopardy.

115.    She could not remember where she had been or under what circumstances.

116.    This occurred in approximately 2015 or 2016.

117.    Looking back, Plaintiff realizes she was the victim of drugging on multiple occasions in the company of TF especially early on.

118.    Especially when pressure was being exerted to do things Plaintiff strongly resisted.

119.    Looking back she can't believe she failed at the time to see where the signs led.

120.    Plaintiff tried to motivate TF to have a normal relationship with her.  But he refused.

121.    Plaintiff thought she could change TF.  But she couldn't.

122.    As time progressed, Plaintiff begged TF not to see anyone but her.

123.    TF promised that would be the case and moved Plaintiff into his home in 2016.

124.    All the while TF was keeping and seeing other women in hotels and other places behind Plaintiff's back.

125.    Despite TF's promises of marriage and a better life, it never materialized.

126.    It turns out TF promised marriage and the same other things to countless women over the same periods of time.

127.    All the while, Plaintiff felt trapped.  Plaintiff was trapped.

## ***Additional Coercion of Plaintiff by TF***

128.    TF placed a GPS tracking device on Plaintiff's vehicle.

129.    In 2015 Plaintiff had a tracking device removed from her car when she discovered it.

130.    Thereafter she believes TF attached another based on receipts she saw.

131.    And, based upon records Plaintiff saw, that such tracking did not end until  November 2020 when TF filed a lawsuit against Kaylee Cathcart.

132.    TF stalked Plaintiff.

133.    She would see him hiding in the bushes or behind building corners as she drove to her apartment, paid for with money provided by TF.

134.    TF would threaten to make her homeless.

135.    TF would threaten to cut off money for the basics of life and for the better life he provided and promised.

136.    TF threatened to take away credit cards, her car, clothing, and gifts he gave.

137.    He would say "I've ruined you".

138.    "You'll never be normal again".

139.    In 2012, after Plaintiff returned from Key West and China, he dangled a brand new BMW that she had picked out to entice her to stay.

140.    Then he manipulatively took it away from her because she tried not to comply with every TF demand.

141.    He was very loud, demanding, and forceful creating great fear in Plaintiff.

142.    TF would not permit her to attend college in person.

143.    TF would say: "Women only go to college to get Mrs. Degrees."

144.    He tried to forcefully control her every move and whereabouts.

145.    There were always other women used to manipulate.

146.    Often extra women were taken on trips to be victimized.

147.    All victims including Plaintiff were intentionally subjected by TF to a great imbalance of power and consent.

148.    Force, deception, coercion, and money were a part of securing the sex that TF demanded.  On one occasion after 2012, TF tackled the Plaintiff and tried to seize her phone so she could not communicate.

149.    All financial dependence and promises would be abruptly withdrawn if Plaintiff and other victims did not comply with all sexual demands.

150.    No financial benefit of any kind was tendered until after sexual demands were met.

151.    Plaintiff saw no way out for years.

152.    She became growingly fearful and physically affected.

153.    Looking back outside the force field of TF's manipulation, deception, threats, and the perpetual fear he created in Plaintiff, all of TF's conduct was about trying to corrupt Plaintiff and regularly securing sex from her, throughout 2012 through 2017, that can only be characterized as "commercial sexual activity" as defined by the Act.

154.   As described above, TF extorted Plaintiff's property, labor, service, credit, "commercial sexual activity" as defined by the Act through wrongful use of force and fear and under color of official right.

155.   TF also caused Plaintiff "serious harm" as defined by 18 U.S.C. §1591.

156.   From 2012 through 2017 Plaintiff was a "victim of human trafficking" at the hands of TF and the entities he controlled.

157.   PVI LLC and P10 participated in trafficking Plaintiff and many other victims by transporting them intra state, inter state, and across international lines on its Jets from 2012 through the present time.

158.   PVI LLC and P10 benefited financially by this participation because TF as President of PV and as owner of a controlling interest in PV, paid PVI LLC for its flight services and expenses.

159.   PVI LLC and P10 also received anything of value in connection with such trafficking transportation violating the Act because its flight expenses including fuel, pilot time and salary, and all other operation expenses were reimbursed by PV under the circumstances described above throughout 2012 to the present time.

160.   As outlined in more detail above, PV and P10 participated in trafficking Plaintiff and other victims in violation of the Act throughout 2012 to the present.

161.   As also outlined above, PV and P10 under the circumstances of its illegal conduct in violation of the Act, was not contractually entitled to the financial benefits of its contracts with ATT and its subsidiaries to the tune of hundreds of millions of dollars per year. That is because both PV and ATT could be required to terminate the contracts by virtue of PV's illegal and immoral conduct outlined above.

14

162.    TF benefitted by the use of these properties to perpetrating his trafficking crimes throughout the alleged time frames.

163.    He could not have secured the sex he desired without them.

164.    TF and his companies have knowingly, intentionally, and purposefully benefited financially or otherwise by participation in violation of the Act.  By using Plaintiff and the other victims as booth bait and requiring them to perform strip shows at fishing tournaments in front of other fisherman, TF used Plaintiff and others as illicit marketing and cheap labor.  TF coerced Plaintiff to engage in commercial sex by creating debts she "owed" him.

165.    TF and his entities acted in concert and unison with TF directing all conduct of his entities.

166.    TF created an entity house of cards that cannot be founded upon the status quo any longer.

### *Plaintiff Escaped TF in 2017*

167.    Plaintiff finally mustered the ability, willpower, and strength to get away from TF.

168.    She was filled with anxiety, stress, duress, and fear.  In 2017, TF took Plaintiff to a tournament in the Bahamas.  Plaintiff was injured and asked Fleming to take her back to Arkansas because she believed she had a concussion.  Fleming refused, alternatively threatening her with harm and promising her marriage.  Ultimately, TF falsely imprisoned Plaintiff, but it did not end there.

169.    Shortly after return to Arkansas, Plaintiff moved in with her parents and started over.

170.     She fearfully holed up at her parent's home for two months with severe anxiety.

171.     She would awaken some mornings and could not feel or even use her legs. They would not work literally.

172.     On other days and times, other parts of her body would go numb.

173.     Plaintiff saw a physician who prescribed medication.

174.     Plaintiff also began counseling.

175.     TF has also made contact with her parents whom he manipulated as well.

176.     So she was afraid she was not safe even with her parents.

177.     Plaintiff has had a very hard time and still suffers today.

178.     She begged her parents not to have any contact with TF and has fearfully avoided all contact with TF since 2017.

179.     She learned recently however that TF had been communicating with her parents.

180.     She discovered texts between TF and her father that took place without Plaintiff's knowledge in July of 2020.

181.     TF was still inquiring about Plaintiff creating a renewed sense of extreme fear.

182.     Plaintiff found this extremely alarming.

183.     Abject fear of TF continues today.

184.     It is one of the main reasons why Plaintiff still suffers today.

185.     The efforts by TF above and below perpetuated inaction by Plaintiff.

186.     It caused her to minimize the frequency of contact with her own parents

out of continuing fear.

187.    TF purchased a car for Plaintiff.

188.    Then TF made Plaintiff sign a promissory note and security agreement prepared by Skip Davidson for the car.

189.    Payments pursuant to the Promissory Note were to go to the "Lender, located at 16101 La Grande Dr., Little Rock, Arkansas . . . "

190.    Plaintiff was to log each time she took a trip with TF on a ledger card provided by TF.  Plaintiff was required to wear a P10 badge from time to time at trade shows and other marketing activities like fishing tournaments and the like.

191.    A value was assigned by TF to each trip and debt on the car was to be reduced by each trip's value.  TF assigned the value for each day based on whether Plaintiff and other victims complied with TF's sexual demands for himself and his business associates. This violated the TVPA and the crossing of state line is engaging in Interstate Commerce.

192.    This was compensation for subjecting Plaintiff to trafficking, involuntary servitude, and commercial sex as defined by the Act.

193.    After each trip, TF would give Plaintiff money, some of which she would give back as a payment for the car.

194.    Some payments to victims involved checks.

195.    Other trafficking payments occurred by credit card for various related places and purposes.

196.    TF used the jet often for personal and business purposes while transporting women across state and federal lines for purposes of commercial sex in

violation of the Act.  He would transport Plaintiff to fishing tournaments in the Bahamas, trade shows in Vegas and China, and business meetings in NYC to use Plaintiff and others as "booth bait[1]" to attract customers, and thereby benefit Plaintiff and his companies financially.

197.    TF's coercion of Plaintiff includes, but is not limited to, abuse or threatened abuse of law or the legal process, threats of serious harm including psychological, financial and reputational harm that was sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

198.    At TF's instruction, Tackett's activities included, but are not limited to (1) procuring TF's cash payments that he tendered in exchange for commercial sex acts, (2) making travel arrangements for sex trafficking including buying commercial air travel tickets, (3) helping to secure passports, (4) conspiring to make as well as making false representations to U.S. Custom Agents including, but not limited to representing that women being trafficked were members of TF's family and that Nicki was related to the women as their aunt.

199.    All of the allegations of the Complaint occurred at times that are relevant and actionable.

### COUNT I – VIOLATION OF THE TVPA

200.    Plaintiff realleges the foregoing as if fully setout herein.

201.    18 U.S.C. §1591(a) provides the following:

Whoever knowingly—

---

[1] Urban Dictionary: booth bait

(1)in or affecting interstate or foreign commerce, or within
the special maritime and territorial jurisdiction of the United
States, recruits, entices, harbors, transports, provides,
obtains, advertises, maintains, patronizes, or solicits by any
means a person; or
(2)benefits, financially or by receiving anything of value, from
participation in a venture which has engaged in an act
described in violation of paragraph (1), knowing, or, except
where the act constituting the violation of paragraph (1) is
advertising, in reckless disregard of the fact, that means of
force, threats of force, fraud, coercion described in
subsection (e)(2), or any combination of such means will be
used to cause the person to engage in a commercial sex act,
or that the person has not attained the age of 18 years and
will be caused to engage in a commercial sex act, shall be
punished as provided in subsection (b).

202.    18 U.S.C. §1591(e)(2) defines coercion as "(A) threats of serious harm to

or physical restraint against any person; (B) any scheme, plan, or pattern intended to

cause a person to believe that failure to perform an act would result in serious harm to or

physical restraint against any person; or (C) the abuse or threatened abuse of law or the

legal process." As alleged herein, Defendant has coerced the Plaintiff into commercial

sex activity while on these trips.

203.    18 U.S.C. §1591(e)(5) defines serious harm as "any harm, whether

physical or nonphysical, including psychological, financial, or reputational harm, that is

sufficiently serious, under all the surrounding circumstances, to compel a reasonable

person of the same background and in the same circumstances to perform or to continue

performing commercial sexual activity in order to avoid incurring that harm."

204.    18 U.S.C. §1591(e)(3) defines commercial sex act as "any sex act, on

account of which anything of value is given to or received by any person."

205.    As demonstrated above, TF violated the act, and Plaintiff was harmed.

Plaintiff seeks a per diem in addition to all other relief. *Mazengo v. Mzengi.* No. 07–756,

2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007)

206.    Plaintiff brings this action pursuant to 18 U.S.C. §1595.  Plaintiff should be compensated for the full amount of losses, which includes "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(a)(3). The amount of restitution need not "be proven with exactitude." *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012).

207.    The TVPA requires courts to compensate victims at the greater of the wages guaranteed by the FLSA or the "gross income or value to the defendant of the victim's services or labor." 18 U.S.C. § 1593(a)(3). United States v. Williams, 783 F. App'x 269, 277 (4th Cir. 2019).  Plaintiff was not paid the value of her labor or the value of her services.

208.    As a direct and proximate cause of Defendant's acts or omissions, Plaintiff has been subjected to human trafficking, forced to submit to deviant sexual activity, and suffered severe emotional distress.

209.    Defendant's conduct has been so egregious as to warrant the imposition of punitive damages.

210.    The Defendant proximately caused Plaintiff to suffer the following damages and Plaintiff is entitled to the following additional relief:

A.       The nature, extent, duration, and permanency of injuries sustained;

B.       Aggravation of Pre-existing conditions;

C.       Medical expenses, past and future;

D.       Pain, suffering, and mental anguish, past and future;

E.        Nominal damages;

F.        Actual damages;

G.        All other statutory damages;

H.        Three times actual damages;

I.        Attorney fees;

J.        Costs;

K.        Punitive and liquidated damages;

L.        Temporary and permanent injunctive relief;

M.        All other statutory relief;

N.        Restitution;

O.        Disgorgement;

P.        All other remedies in law or equity; and

Q.        All other proper relief sought in this Complaint or to which Plaintiff is entitled at law or equity.

## JURY DEMAND

211.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and an award of all of the damages and other remedies and relief sought above and for all other proper relief, the sums of which far exceeds the amount of $1,000,000.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910  Office

501-375-1916  Facsimile
Attorney for the Plaintiff

By:   /s/ Luther Oneal Sutter
Luther Oneal Sutter, AR Bar No. 95031
luther.sutterlaw@gmail.com